**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>v.<br><br>EARNSPARK GLOBAL CONCERNS, and CITIBANK, N.A., a nominal defendant,<br><br>          Defendants. | **CIVIL ACTION NO.  1:26-cv-1155**<br><br><br><br>**VERIFIED COMPLAINT** |

## THE PARTIES

1.　　Plaintiff, Chicago Title Insurance Company ("Plaintiff") is a Florida corporation with a business office located at 1700 Market Street, Suite 2100, Philadelphia, PA 19103.

2.　　Defendant Earnspark Global Concerns ("Earnspark") is, upon information and belief, a Nigerian business entity with an address located at Zone D, Exodus Block Aspamda, Trade Fair, Amuwo, Lagos State.

3.　　Upon information and belief, Earnspark is the holder of a bank account maintained at Citibank, N.A. ("Citibank") with an account address located at 13th Street, New York, NY 10011 ("Fraudulent Account").

4.　　Earnspark, together with its agents, representatives, and associates, are  referred to collectively as the "Earnspark Bad Actors."

5.　　Upon information and belief, the acts and omissions alleged  herein were undertaken by the Earnspark Bad Actors  with the express knowledge, consent, and ratification of Earnspark and its officers, agents, employees, or representatives, while actively engaged in the management or operation of Earnspark's business or affairs.

6. Upon information and belief, all Earnspark Bad Actors, and each of them, were the agents and/or employees, co-venturers, partners or in some manner agents and/or principals for each other, and at the time of the incidents which comprise the Complaint herein, were acting within the course and scope of said agency and/or employment, with Earnspark's knowledge, consent, and approval.

7. Defendant Citibank is a national banking association with its main office at 388 Greenwich Street, New York, NY 10013.

8. Citibank is named as a nominal defendant in this action solely due to the fact that it maintains custody and control over the Fraudulent Account into which funds from an escrow account controlled by Plaintiff were fraudulently diverted through the use of fraudulent wire instructions and other documents as more fully described below.

9. As a nominal defendant, Plaintiff seeks no relief from Citibank at this time other than an Order freezing the account into which the monies were fraudulently diverted, and any other account at Citibank or any other banking institution into which funds were transferred and enjoining any further banking activity in those accounts until further Order of Court, and directing Citibank to return any remaining funds and to trace any funds that left the Fraudulent Account

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under the Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030 (the "CFAA").

11. This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 by virtue of complete diversity of citizenship and because the amount in controversy exceeds $75,000, exclusive of interests and costs.

2

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, because Earnspark has an address located in this District, and because the subject Fraudulent Account is located in this District and held with Citibank, which maintains its principal offices in this District.

## BACKGROUND

13.     This matter concerns the fraudulent diversion of $4,156,888.79 (the "Sale Proceeds") from the sale of real property located at 22-26 Memorial Boulevard West, Newport, RI 02840, along with, *inter alia*, all improvements located thereon, which were owned by Non-Party, LD Properties, LLC ("LD Properties"),  and certain personal property owned by American Bistro, LLC ("American Bistro") (LD Properties and American Bistro are referred to collectively as "Sellers") (collectively, the real property and personal property sold are referred to as the "Property"), which proceeds were directed to be fraudulently transferred via wire to a bank account ending in 9295 that is purportedly owned by "Earnspark Global Concerns" and held by Citibank (the "Fraudulent Account").

14.     Non-Party 24 Memorial Propco, LLC ("Buyer") purchased the Property from LD Properties, as seller, with closing and settlement to occur on January 22, 2026.

15.     Buyer was represented in the transaction by Non-Party AR Global, through its Assistant General Counsel, Matthew A. Lyons, Esquire.

16.     Plaintiff served as the escrow and disbursing agent in connection with the sale and was responsible for wiring the Sale Proceeds pursuant to instructions to be provided by the Sellers.

17.     Sellers acted through their principal and Manager, Non-Party David Butterfield, who, upon information and belief, was at all times authorized to act on their behalf.

18.    Sellers also acted through their counsel, Non-Party Joseph H. Olaynack III of the law firm Corcoran, Peckham, Hays, Leys & Olaynack, PC ("Sellers' Counsel").

19.    Finally, Sellers' financial agent with respect to this transaction was Non-Party, SCS Financial, through Bobby Wyman, its Vice President, Private Client Group..

## THE FRAUDULENT WIRE INSTRUCTIONS

20.    Because the parties and their representatives were located in different physical locations, the closing was performed remotely, with communications being held via both email and telephone in the days leading up to the transaction and on the actual date of closing, January 22, 2026,.

21.    Upon information and belief, at some point, the Earnspark Bad Actors compromised the computers of one or more parties to the transaction (not Plaintiff's).

22.    The compromised computers were computers that were used by the parties in or affecting interstate commerce or communication and were therefore "protected computers" under the CFAA.

23.    The unauthorized access to these computers and the use of that access to commit fraud is a direct violation of the CFAA.

24.    On January 21, 2026 at 1:48 PM, Sharon Hughes, Plaintiff's Vice President/National Commercial Closer, received wire instructions from Sellers' Counsel directing that funds be wired to an Earnspark-titled account of at Citibank which, unbeknownst to Plaintiff, was a Fraudulent Account. A true and correct copy of that email is attached hereto as Exhibit "A".

25.    Concerned that the Earnspark entity did not match the Sellers or any entity previously identified as party to the transaction, Ms. Hughes contacted Sellers' Counsel at 3:08 PM on January 21, 2026, to  request confirmation that the wire instructions were correct.

26.     Immediately thereafter, at 3:18 PM on that same date, Sellers' Counsel emailed Mr. Butterfield, Sellers' Manager and principal, copying Ms. Hughes, and asked Mr. Butterfield to confirm the "wire instructions which I delivered to her earlier today from Bobby Wyman at SCS Financial, which call for the funds to be wired to an investment account with Earnspark Global Concerns named as the beneficiary." A true and correct copy of that email is attached hereto as Exhibit "B". *See* Ex. "B" at p. 2.

27.     Sellers' Counsel explained that confirmation was needed because the account beneficiary was not either of the selling entities and advised that confirmation could be "done via a simple email." *Id.*

28.     At 3:27 PM, Ms. Hughes received an email purportedly from Mr. Butterfield replying to Sellers' Counsel's email stating, "The wire instructions provided are accurate. This is my trust account, and I confirm that the wire may be processed accordingly." A true and correct copy of that email is attached hereto as Exhibit "C".

29.     At 3:45 PM that afternoon, Ms. Hughes called the telephone provided to her at SCS Financial for Bobby Wyman and confirmed the wire instructions and that two separate wire transfers – one in the amount of $1,368,017.39 and one in the amount of $2,788,871.40 – were to be wired to the Fraudulent Account. A true and correct copy of those confirmations is attached hereto as Exhibit "D". Ms. Hughes spoke with an individual who identified himself as Bobby, but inadvertently wrote "Billy" on the confirmations. *See* Ex. "D".

30.     The $1,368,017.39 wire represented the payment made to American Bistro in exchange for the assets and personal property that it sold to Buyer, while the $2,788,871.40 wire represented the money paid to LD Properties by Buyer in exchange for the real property and improvements thereon.

5

31.     The next day, January 22, 2026, the closing occurred. After receiving confirmations from both parties, including authorization from Sellers' Counsel, Ms. Hughes released the wires and sent confirmations to the parties. A true and correct copy of the wire confirmations is attached hereto as Exhibit "E".

32.     On January 23, 2026 at 9:18 AM, Sellers' Counsel emailed Ms. Hughes and Ann-Marie Widmann at Plaintiff, and advised that Sellers' wires had not been received yet and that Mr. Wyman at SCS Financial had asked him to have Plaintiff check the status on its end. A true and correct copy of that email is attached hereto as Exhibit "F".

33.     At 9:53 AM, Ms. Hughes received an email from Mr. Butterfield's email account, stating "The wires processed to my trust account have not yet been credited[,]" and asked her to "confirm whether the wires were processed using the FFC information provided[.]" See Ex. "F"

34.     At 10:12 AM, Ms. Hughes responded to the email that she received from Mr. Butterfield's email account stating that they were and advising that I had confirmed with "Billy", though she intended to reference Mr. Wyman. Id.

35.     At 11:12 AM, Mr. Butterfield emailed Ms. Hughes and Sellers' Counsel, stating, "The wires are currently pending and will credit my account soon." A true and correct copy of that email chain is attached hereto as Exhibit "G".

36.     Sellers' Counsel responded at 11:32 AM, stating, "Good news, Dave. Thanks, Sharon." See Ex. "G".

### DISCOVERY OF FRAUDULENT WIRING

37.     Plaintiff heard nothing more from Mr. Butterfield, Sellers' Counsel, or anyone else acting on Sellers' behalf between January 23, 2026 and February 7, 2026, when Ms. Hughes received an email from Sellers' Counsel, stating that SCS Financial advised him that "morning

6

that the seller's [sic] proceeds were never received in Dave Butterfield's account and may have been misdirected to a fraudulent account." A true and correct copy of that email is attached hereto as Exhibit "H".

38.    Sellers' Counsel further advised that Mr. Butterfield's "email was hacked prior to closing and numerous emails and possibly telephone calls purportedly made by us and others with Dave and Bobby Wyman were fraudulent." *See* Ex. "H".

39.    Accordingly, via the February 7, 2026 email, Sellers alerted Plaintiff to the Earnspark Bad Actors' fraud for the first time.

40.    On February 9, 2026, the first business day after receiving the fraud alert, Plaintiff promptly issued a wire recall to Citibank.

41.    However, as of the date of this filing, Plaintiff has not been made aware that the recall has been successful and the money has not been returned.

42.    Sellers have confirmed that it did not receive any of the Sale Proceeds and that the account into which these funds were wired is not an account in which it has any interest.

43.    Plaintiff has incurred, and continues to incur, losses and expenses related to investigating and addressing the diversion, seeking recovery, and coordinating with affected parties and institutions.

**FIRST CLAIM FOR RELIEF**
**Violation of the CFAA Against Earnspark**

44.    Plaintiff incorporates by reference all the other allegations contained in this Verified Complaint.

45.    The Earnspark Bad Actors intentionally accessed, without authorization or in excess of authorization, one or more protected computers used in or affecting interstate commerce by participants in the subject transaction and used that access to perpetrate a fraud.

46. The Earnspark Bad Actors knowingly used the unauthorized access to facilitate the fraudulent wire instructions and related communications described above.

47. The conduct engaged in by the Earnspark Bad Actors is a direct violation of the CFAA.

48. The CFAA specifically provides that any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator and may obtain compensatory damages and injunctive or other equitable relief.

49. Plaintiff seeks all relief available under the CFAA, including injunctive measures to prevent further dissipation or transfer of the diverted proceeds and assets traceable thereto.

## <u>SECOND CLAIM FOR RELIEF</u>
### Fraud Against Earnspark

50. Plaintiff incorporates by reference all the other allegations contained in this Verified Complaint.

51. Earnspark made false representations to Plaintiff through their sending of the Fraudulent Wire Instructions. Specifically, in sending the Fraudulent Wire Instructions, the Earnspark Bad Actors represented that Plaintiff could transfer the Sale Proceeds into the Fraudulent Account in payment of the amounts due to Seller. The dates, speakers, and content of the false statements are described with particularity above.

52. Upon information and belief, each false statement made in connection with the Fraudulent Wire Instructions was knowingly made and was designed to defraud Plaintiff.

53. Plaintiff was in fact deceived by the Earnspark Bad Actors' false statements and actions.

54. Plaintiff reasonably relied upon the Earnspark Bad Actors' false statements and actions to its detriment.

8

55.     The misrepresentations made by the Earnspark Bad Actors were material in that Plaintiff would not have transferred the funds to the Fraudulent Account but for the Fraudulent Wire Instructions.

56.     The Earnspark Bad Actors' false statements and actions have directly and proximately damaged Plaintiff in an amount to be determined at trial, but that is not less than $75,000.00.

57.     Because of the willful or wanton conduct of the Earnspark Bad Actors as described above, the Earnspark Bad Actors are liable to Plaintiff for both compensatory and punitive damages.

58.     At all times relevant hereto, upon information and belief, the Earnspark Bad Actors were acting at the direction and/or for the benefit of Earnspark.

### THIRD CLAIM FOR RELIEF
**Constructive Trust Against All Defendants**

59.     Plaintiff incorporates by reference all the other allegations contained in this Verified Complaint.

60.     The Earnspark Bad Actors, on behalf of and for the benefit of Earnspark, wrongfully and without authorization obtained the Sales Proceeds.

61.     The Earnspark Bad Actors' fraudulent conversion of the funds was wrongful, as the intent of the fraudulent actions was to deprive Seller of the Sale Proceeds and to expose Plaintiff to a risk of loss for the transfer of the proceeds to the Fraudulent Account.

62.     As a result of the wrongful conduct of the Earnspark Bad Actors, a constructive trust is warranted over the monies transferred into the Fraudulent Account and any assets acquired with, or traceable to the stolen proceeds.

63.     In particular, a constructive trust is warranted over any remaining funds in the

9

Fraudulent Account at Citibank or any other Citibank accounts into which the funds have been transferred.

64.     Citibank should be declared a constructive trustee of the monies remaining in the Fraudulent Account or any other Citibank accounts into which the funds have been transferred.

65.     Accordingly, Plaintiff respectfully requests that the Court impose a constructive trust on the fraudulently obtained funds, as well as any and all monies or other assets which can be traced to the stolen funds; direct Citibank to maintain possession of any and all such proceeds pending further Order of this Court; and granting Plaintiff such other relief as may be just and proper.

## FOURTH CLAIM FOR RELIEF
### Request for Injunction

66.     Plaintiff incorporates by reference all the other allegations contained in this Verified Complaint.

67.     Earnspark acquired the monies from the sale of the Property by fraudulent means.

68.     Based on the manner in which the proceeds were diverted, it is likely that Earnspark will dissipate the monies in the Fraudulent Account if not enjoined from doing so, making it difficult, if not impossible, to recover the converted monies.

69.     This Court has the authority to issue an injunction to enjoin the dissipation of funds.

70.     The CFAA specifically provides for the award of injunctive relief.

71.     Earnspark must be enjoined from utilizing or transferring any monies received as a result of the fraudulent conduct, and from utilizing or transferring any other monies or assets acquired with the monies received as a result of the fraudulent conduct, including the monies in the Fraudulent Account at Citibank or any other Citibank accounts into which the funds have been transferred.

72.    Citibank should be enjoined from allowing the distribution of any monies in the Fraudulent Account without Order of this Court.

73.    Plaintiff has shown a likelihood of success on the merits as to the foregoing claims for relief, based on the allegations set forth in this Verified Complaint.

74.    Plaintiff is without an adequate remedy at law in this matter, as dissipation of the fraudulently diverted funds may render the funds practically unrecoverable.

75.    Plaintiff will suffer immediate and irreparable harm if Earnspark is not enjoined from dissipating assets obtained through the fraud, and if Citibank is not directed to freeze any accounts into which proceeds from the fraudulent diversion of the sales proceeds were placed, including but not limited to the Fraudulent Account.

76.    No harm will be suffered from the issuance of an injunction to preserve the monies in the Fraudulent Account and any other assets acquired with the proceeds received from the fraudulent conduct. Earnspark has no legitimate claim to the monies sought to be preserved herein, and therefore cannot suffer harm from the issuance of an injunction.

77.    Greater harm will be suffered by Plaintiff if the injunctive relief is not granted.

78.    Granting the preliminary relief requested is in the public interest, as Earnspark has no right to benefit from the fraudulently diverted funds at the expense of the legitimate parties to the transaction and such conduct should properly be prohibited.

79.    Plaintiff respectfully requests that this Court issue an Order: (1) enjoining Earnspark  from engaging in any activity in connection with the monies in the Fraudulent Account at Citibank and freezing that account, and any other account at Citibank or any other banking institution into which monies were transferred, so as to preclude the Earnspark Bad Actors and/or Earnspark from withdrawing any monies from those accounts until further Order of Court; (2)

11

enjoining Citibank from permitting any withdrawals or transfers of monies in the accounts pending further Order of this Court; (3) enjoining the Earnspark Bad Actors from utilizing, transferring, or in any manner disposing of any other assets which might have been acquired with the monies fraudulently obtained as set forth in this Complaint; (4) requiring Citibank to return any remaining funds pursuant to the pending recall; (5) requiring Citibank to trace any funds that left the Fraudulent Account; and (4) granting such other relief as may be appropriate and necessary.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1. Impose a constructive trust on the fraudulently obtained Sale Proceeds, as well as any and all monies or other assets which can be traced to the stolen funds;

2. Enter an Order enjoining Earnspark from engaging in any activity in connection with the monies in the Fraudulent Account at Citibank and freezing that account, and any and all accounts at Citibank or any other banking institution into which monies were transferred, so as to preclude Earnspark from withdrawing any monies from those accounts until further Order of Court;

3. Enter an Order enjoining Citibank from permitting any withdrawals, transfers of monies, or other banking activity in the accounts, including the Fraudulent Account and any and all other accounts into which proceeds from the fraudulent diversion were placed pending further Order of this Court;

4. Enter an Order enjoining Earnspark from utilizing, transferring, or in any manner disposing of any other assets which might have been acquired with

12

the monies fraudulently obtained as set forth in this Complaint;

5.  Award Plaintiff such compensatory damages against Earnspark as Plaintiff may prove at trial;

6.  Award Plaintiff punitive damages for Earnspark's willful and malicious conduct;

7.  Award Plaintiff its costs and reasonable attorneys' fees as allowed by law;

8.  Allow a trial by jury as to all matters so triable; and

9.  Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: February 11, 2026

**FOX ROTHSCHILD, LLP**

By:    */s/ Elizabeth Viele*
       Elizabeth Viele
       Fox Rothschild LLP
       101 Park Avenue, 17th Floor
       New York, NY 10018
       Tel: (212) 878-7900
       Fax: (212) 692-0940
       *Counsel for Chicago Title Insurance Company*

## VERIFICATION

Sharon Hughes hereby declares that she is Vice President/National Commercial Closer of Plaintiff, Chicago Title Insurance Company, and is authorized to make this statement on its behalf: I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026

Sharonkay Hughes